81 So.2d 637 (1955)
The BOARD OF PUBLIC INSTRUCTION OF DADE COUNTY, Florida, a body corporate and politic under the laws of the State of Florida, Appellant,
v.
TOWN OF BAY HARBOR ISLANDS, Florida, a municipal corporation, Appellee.
Supreme Court of Florida. Special Division B.
April 29, 1955.
Rehearing Denied May 27, 1955.
*638 Boardman & Bolles, Miami, for appellant.
Lewis Horwitz, Miami Beach, for appellee.
DREW, Justice.
This is an appeal from a final decree of the Circuit Court of Dade County requiring the Board of Public Instruction of Dade County, Florida, hereafter called the Board, forthwith to perform the terms and conditions of a contract of sale of certain *639 lands located within the corporate limits of the appellee Town of Bay Harbor Islands, hereafter called the Town, from William G. Mechanic and his wife and, at the same time, permanently enjoining and restraining the Board from locating, erecting or operating a public school building or any building for school purposes on such property.[1]
This litigation arose out of the opposition of the Appellee Town to the construction of a public school within its corporate limits. It was the contention of the Town that the limited area of the municipality, located as it was entirely upon two islands in Biscayne Bay, rendered it impractical and burdensome on the Town and its inhabitants to construct a public school within its limits. Many collateral issues were involved in the litigation and much of the very large record in this Court consists of testimony on these subjects.[2] In the final analysis, however, the only justiciable issue involved in the litigation was thus stated by the master in his very long and exhaustive report: "The question that is brought sharply into focus and the master feels that it is the only real issue involved in the cause is whether or not the restrictive covenant prohibiting the use of the property for school purposes is applicable to the school board in its attempt to use the same for such school purposes."
Concerning this question the master concluded that the use of the subject property and other adjacent property, title to which it had theretofore acquired, for a public school purpose was a violation of the restrictive covenants pertaining to said lands. He recommended the entry of the decree appealed from.
The power of the Board to acquire these lands or the proper and regular exercise of that power is not involved in the instant appeal.[3]
Two questions are involved in this appeal. The first is whether the restrictions, infra, which were placed upon the subject lands at the time and which formed a part of a general plan of subdivision of lands composing the municipality, are broad enough to prohibit the use of said lands for school purposes and, if so, whether they may be enforced against the Board. The second is whether such restrictions constitute property in those in whose favor such restrictions exist for which compensation must be made in the event said lands are acquired for public purposes. A negative answer to the second question would obviate the necessity of answering the first question; *640 hence we proceed to a discussion of the latter proposition.
The restrictions are:
"Except for Lots 1 and 2 in Block 1; Lots 36 and 37 in Block 4; all of Blocks 11, 12, 20 and 21; and Tracts A, B, C, D, E and F of the East Island, no building shall be erected or constructed or maintained on any lot in the East Island other than residences, duplexes, apartments, apartment hotels, hotels or club hotels; no business building may be erected on said lands or any part of said lands, and no business may be conducted thereon except such business as is directly concerned with and incidental to each individual apartment house, apartment hotel, hotel or club hotel, as the case may be. If any such incidental business is conducted in any building on said land, then no shop or store or concession for any such business shall have any outside entrance or outside store-front or outside signs or displays, lighting or advertising; access thereto being exclusively limited to and through the inside of the building."
At the threshold we emphasize that the restrictions quoted above and with which we are concerned in this case do not fall within the category of true easements, such as the right of passage, use, or rights of light, air and view. See 18 Am.Jur., Eminent Domain, p. 786, Sections 156-158, especially Section 158. Easements such as these fall into a separate category from easements such as those we are dealing with in this case. These latter easements have been defined, and we think correctly, as negative easements or equitable servitudes. Such so-called easements are basically not easements in the strict sense of the word but are more properly classified as rights arising out of contract. It may well be that the failure of some of the courts to recognize this real difference has led to the confusion and the "irreconcilable conflict" in the decisions.[4]
The courts are not in agreement as to whether such easements or restrictions are binding upon the acquiring authority when such lands are acquired for a public use. The author states in Note, 1939, 122 A.L.R. 1464, that "in determining whether the right thus created is one of property for which compensation must be made when land subject to such right is taken by eminent domain or is voluntarily deeded to be used for public purposes, the courts remain in irreconcilable conflict." In 18 Am. Jur. 788, Section 157, it is said that "building restrictions are a property right, and where, through the exercise of the power of eminent domain, there is a taking or damage of such property rights, then owners of property for whose benefit the restrictions are imposed are entitled to compensation for the loss of the easements created by such restrictions, although there are a few cases to the contrary." (Emphasis supplied.)
The whole subject is discussed at length in Nichols on Eminent Domain, (3rd ed. 1950) Volume 2, Section 5.73, as follows:[5]
"5.73 Restrictive covenants.
"A rather perplexing situation arises out of the existence of what are commonly called `building restrictions.' A large tract of land is often cut up into lots and sold for residential purposes, and each lot is sold subject to restrictions against use for various purposes, the restriction upon each lot being for the benefit of all the others. So far as such restrictions are reasonable *641 in their character, they are enforced by courts of equity in favor of the original owner, so long as he continues to own any part of the tract for the benefit of which the restrictions were created, as well as in favor of the owner of any one of the lots into which the tract was divided, and against the owner of any of the lots who attempts to disregard the restrictions.
"A conflict of opinion has arisen in the disposition of the question whether a person in whose favor such a restriction exists has a compensable interest in a condemnation proceeding which prevents compliance with such restriction.
"[1] Majority view.
"The majority view holds that such a restriction, often characterized as an equitable servitude, constitutes property in the constitutional sense and must be compensated for if taken. Such restrictions constitute equitable easements in the land restricted, and when such land is taken for a public use and will violate the restrictions, there is a taking of the property of the owners of the land for the benefit of which the restrictions were imposed. The owners of such property cannot maintain proceedings for damages against the original owner or enforce the restrictions against the condemnor, but they are entitled to an award of compensation for the destruction of their easements.
"If the existence of the easement diminished the value of the land subject thereto, as is ordinarily the case when the easement is of such a character as a right of way, the compensation of the holder of the easement might well be deducted from the sum awarded to the owner of the servient tenement. In the case of mutual building restrictions, however, the existence of the restrictions often enhances rather than decreases the value of the land, and the owner of the land taken might consequently well object to receiving in any event less than the fair market value of his property as a piece of real estate.
"[2] Minority view.
"On the other hand, objection, has been raised to paying more than such value for all the interests in the property taken and by reason thereof negative easements belonging to other owners have been taken without payment of compensation.
"It has been argued that such restrictions were not intended to apply as against public improvements;  that, since all property is held subject to the power of eminent domain, the rights of the condemnor are impliedly excepted from the operation of the restrictive covenant.
"It has further been held that such restrictions could not possibly inhibit the action of the sovereign because any such attempt would be void as against public policy since they constitute an attempt to prohibit the exercise of the sovereign power of eminent domain. Since the state has the power to condemn the fee prior to the imposition of a restrictive covenant, the placing of the additional burden upon the land does not create a new compensable interest.
"Denial of compensation has also been justified upon the ground that such restrictions do not constitute property at all, but are merely contract rights which need not be compensated for in eminent domain. Such contract rights, it has been reasoned, are enforceable as against individuals but not as against the state.
"The final argument in support of a denial of compensation in a specific case is predicated upon a construction of the particular restrictive covenant in such manner that the prospective use does not constitute a violation thereof."
Our study of the problem leaves considerable doubt in our minds that, at this time, the view stated in American *642 Jurisprudence and Nichols on Eminent Domain, supra, to be the majority view is actually that.[6] The recent trend, and we think the better view, if it is not actually the majority view, is that so ably presented and adopted by the Georgia Supreme Court in 1939 in the case of Anderson v. Lynch, 188 Ga. 154, 3 S.E.2d 85, 122 A.L.R. 1456, a case of first impression in that court. There it was concluded, after a review of the cases on the subject, and in full recognition of the substantial authority to the contrary, that restrictions of the kind we are concerned with here, and which were being dealt with in that case, convey no interest in the land, are not true easements, and at best may be relied upon and enforced between the parties thereto and their successors with notice. That Court concluded, and we think correctly, that such restrictions do not vest in the owners of other lands in the subdivision a property right for which compensation must be made in the event said lands are taken for and devoted to a public use even though such use is inconsistent with the use to which said lands are restricted by private agreement.
It is a well recognized rule that damages may not be recovered because of the depreciation in value of nearby property which may result by the construction of a public building in the vicinity.[7]
This rule was alluded to by the Court in United States v. Certain Lands (In re Newlin) C.C., 112 F. 622, 628, 629, affirmed 1 Cir., 153 F. 876, in discussing the reasons why such restrictive covenants created no property rights for which compensation must be made when acquired for public use. The Georgia Supreme Court in Anderson v. Lynch, supra, relied strongly on the federal case in its determination of the question. We think the logic there expressed by the District Judge is so compelling as to be worthy of reiteration.
"As each owner of land holds his property subject to the devesting of his title through the action of the state or of the United States, based on public necessity, can he by any means, directly or indirectly, impose upon the state or the United States the burden of compensating him for damage resulting from that public use which does not directly invade his land? * * * Can it be possible that these owners, by mutual agreements or covenants that they or their successors in title will not do things which may be necessary for national defense, and by agreeing that these things are noxious and offensive to them, compel the United States to pay them for the right to do, upon lands taken, what is necessary for the protection of the nation?
"If such a right can exist against the state or nation, and can be considered property, then only a mere device of conveyancing is necessary to defeat entirely the rule that depreciation of property incidental to a public use does not constitute a `taking'; for private deeds may then provide in express terms against such uses as may be necessary in case the government exercises the right of eminent domain. If these private covenants are, as against the government and state, to be recognized as property, then the government, by taking such uses, takes private property, and must make compensation.
"* * *
"* * * While the owners may so contract as to control private business, and thereby increase the values of their estates, they are not entitled so to contract as to control the action of the government or to increase the values of their lands by any expectation or belief that the government will not carry on public works in their vicinity, or that *643 in case it does it will compensate them for the loss due to the defeat of their expectation that it would not. * * * Each landowner holds his estate subject to the public necessity for the exercise of the right of eminent domain for public purposes. He cannot evade this by any agreement with his neighbor, nor can his neighbor acquire a right from a private individual which imposes a new burden upon the public in the exercise of the right of eminent domain." (Emphasis supplied.)
See also Doan v. Cleveland Short Line R. Co., 92 Ohio St. 461, 471, 112 N.E. 505, 507; Moses v. Hazen, 63 App.D.C. 104, 69 F.2d 842, 98 A.L.R. 386, 389.
The California courts are among those which have long since adopted the rule which the Georgia Court in Anderson v. Lynch, supra, concluded to be the better rule. In Sackett v. Los Angeles City School District, 118 Cal. App. 254, 5 P.2d 23, 24 after discussing many of the cases on the subject and the conflicting theories involved, the court said:
"The courts of California have, however, declined to recognize a building restriction of the character here under consideration as a positive easement or right in the land, but have defined it to be merely a right enforceable in equity as between the parties to the contract, or their successors with notice, and have said that it is in the nature of a negative easement or equitable servitude. Werner v. Graham, 181 Cal. 174, 183 P. 945; Martin v. Holm, 197 Cal. 733, 242 P. 718; Friesen v. City of Glendale, 209 Cal. 524, 288 P. 1080, 1082."
The Constitution and laws of this State are a part of every contract. Every person is charged with knowledge that any land may be taken by the sovereign for public purposes at any time. It was stated by this Court in Shavers v. Duval County, Fla. 1954, 73 So.2d 684, 690, "The right to own and acquire property by the individual is subject to the right or power of eminent domain. The right or power of eminent domain possessed by the sovereign is limited or restrained by that provision of the Constitution for the protection of the individual against arbitrary power that such private property shall not be taken for a public purpose without just compensation." In this case, we were dealing with the question of whether the right to receive interest under a long term mortgage was a property right for which the owner of the mortgage must be compensated in the event the lands encumbered by the mortgage were condemned and taken for public use prior to maturity of the obligation secured by the mortgage. In that case, we held that such rights were not property rights in a constitutional sense.
We think the conclusion reached by us is not only supported by what we believe to be the best considered cases but also by logic and reason. Were we to recognize a right of compensation in such instances, it would place upon the public an intolerable burden wholly out of proportion to any conceivable benefits to those who might be entitled to compensation.[8] In the event of the construction of a public building in a large subdivision containing many separate ownerships, a determination of the varying degrees of damage, if any, which might be claimed by the individual lot owners would present obstacles of an unwarranted *644 nature in the exercise of the sovereign power. It would afford little, if any, actual benefit to the landowner.
Moreover, were we to adopt the rule contended for by appellee and hold that restrictions of the nature which we have been discussing constitute property for which compensation must be made, it would be necessary in all instances where streets or highways were extended or enlarged through subdivisions having restrictions of such nature that the consent of every property owner in such subdivision be obtained or his interest acquired by eminent domain before such improvement could lawfully be made. It would be just as much a violation of a restriction limiting the use of specific property to residential purposes to construct a road or a sidewalk over it as a school or fire house or town hall. While these considerations are not controlling, where there is respectable authority both ways, they would be compelling and forceful factors in the determination of which way the scales of reason and justice incline. In such cases the courts should consider practical matters and problems as well as theories.
Having reached the conclusion we have, it becomes unnecessary for us to pursue the first question further except to observe that the answer we have given to the second question necessarily determines that the restrictions may not be enforced against the Board.[9]
That portion of the final decree requiring the Board to consummate the purchase of the subject land from the appellee Mechanic and his wife be and the same is hereby affirmed but that portion of the decree which enjoins the Board from using said lands for school purposes is hereby reversed with directions to the lower court, if found to be essential to the orderly and proper disposition of this litigation, to enter a revised decree in accordance with the views herein expressed.
Reversed in part and affirmed in part.
MATHEWS, C.J., and THOMAS and BUFORD, JJ., concur.
NOTES
[1] In paragraph (c) of the final decree of the lower court, and as a part of its findings, appears the following rather unusual provision:

"(c) That the plaintiff, Town of Bay Harbor Islands, Florida, a municipal corporation, by and through its attorneys, have represented to the Court that it will hold harmless the Defendant, The Board of Public Instruction of Dade County, Florida, from any loss or damage by reason of the said Defendant having to perform its contract with the Cross-Defendants, or having purchased any other property in said municipality, to the extent of repurchasing or furnishing a purchaser of any property owned by the said Defendant, The Board of Public Instruction of Dade County, Florida at cost, provided that the said Defendant, The Board of Public Instruction of Dade County, Florida shall call upon the Plaintiff to carry out its undertaking in this regard within sixty (60) days of the date of this Final Decree, * * *."
[2] The master's findings and recommendations consisted of twenty-seven pages of the printed record. He found, among other things, that the Board had ample authority to purchase the subject property and that in the exercise of its discretion to do so there appeared no bad faith, abuse or oppression. He found further that the allegations of the complaint that it would be a burden on the Town to support a school property were not supported by the evidence. He further found that the zoning ordinances were insufficient to prevent the use of the subject lands for school purposes. Appellee Town filed no cross-appeal on these points, hence they may not be considered here.
[3] See Footnote 2.
[4] See Note, 1952, 25 A.L.R.2d 904, 916, particularly conclusion on 918-919.
[5] Among the states cited as supporting the majority view by Nichols on Eminent Domain is California. The cases cited by him do not support the text. On the contrary, it clearly appears that the California courts hold exactly contrary to that suggested by Mr. Nichols. See Sackett v. Los Angeles City School District cited in the text. It is also interesting to observe that Georgia is not listed among those states which support the so-called minority view although Anderson v. Lynch, quoted in the text, was decided in 1939.
[6] See Footnote 4.
[7] This is particularly true under the Florida Constitution which does not expressly forbid "damage" to property without just compensation. See Arundel Corporation v. Griffin, 89 Fla. 128, 103 So. 422, 424, and cases there cited. See also 2 Nichols on Eminent Domain, (3rd ed. 1950) Section 6.4432 and the authorities there mentioned.
[8] This problem was apparently uppermost in the minds of the California court in Sackett v. Los Angeles City School District, supra, Note 5. The court concluded its opinion with the following language:

"It presents the situation of an agency of the state created for the sole purpose of providing adequate educational facilities for the youth of a certain limited area against whom there is sought to be invoked the aid of equity to enforce a restriction created by the provisions of a private contract to which the state was in nowise a party and by which it neither expressly nor by necessary implication consented to be bound. The state may not be thus hampered in carrying out a purpose in which it is so vitally interested."
[9] It is unnecessary for us to determine whether the restrictions in this case are broad enough to embrace within the prohibited uses a school or other public building. This Court has consistently construed such restrictions in favor of the free and unrestricted use of property. See Moore v. Stevens, 90 Fla. 879, 106 So. 901, 43 A.L.R. 1127, and the authorities there cited.