FIRST DISTRICT COURT OF APPEAL
STATE OF FLORIDA

_____

No. 1D2024-0199
_____

CITY OF PARKER,

    Appellant,

    v.

JOYCE WILSON,

    Appellee.

_____


On appeal from the Circuit Court for Bay County.
William S. Henry, Judge.


June 25, 2025


KELSEY, J.


The City of Parker is a community on Florida's northern Gulf of America coast, in Bay County, east of Panama City Beach. Within the City lies Point Donalson, which extends into St. Andrews Bay. On Point Donalson is a waterfront cove, Estelle Cove, that opens into Pitts Bayou, thence into the Bay. On Estelle Cove is an unnamed park with waterfront access (the Park).

The Point Donalson subdivision was first platted before 1950, but the earliest plats did not label the park area as a park. Rather, what later became the Park was originally part of two streets, and an open area. A Third Amendment recorded in 1955 first labeled the Park as such, and the County approved the plat. Over the ensuing decades, first the County, and then the City—after it was

incorporated in 1967 and assumed the rights, powers, and duties that the County previously exercised over the area encompassed by the new City—made improvements to the Park. What started as a mid-century neighborhood's grassy waterfront park has become a developed—and well-used—boat-launching site with a paved road, a boat ramp, parking area, and a City-owned sewage lift station, among other improvements.

The main issue before us is whether the Park is public or private. Appellee Wilson, who owns a lot in Point Donalson with her husband, sued to have the Park declared private, and sought removal of Park improvements. The trial court held that the Park is private, and the City appeals. We reverse. The Park is public.

**Pertinent History.**

Wilson and her husband bought a lot in Point Donalson in 2002, from one of the subdivision's seven original dedicators, Mr. Harders. Upon purchasing the lot, they received from him written and oral information about the Park's history, documenting long-running questions about its status and usage. This information included a clarifying statement that four of the original seven dedicators had recorded in 1976, asserting retroactively that their original intent was for the Park to be solely for Point Donalson property owners' private use, and purporting to restrict permissible activities in and connected with the Park.

In the 1955 plat amendment, the seven original dedicators reserved "the right to restrict the use of all riparian rights to non-commercial purposes as naturally pertain to property having water front." The plat amendment went on to provide that "such restrictions may be made by separate testament containing such restrictive covenants and placed of record" that the "dedicators and owners may cause to be placed upon the use of said lands shown hereon by subsequently recorded instruments as may be desirable or advisable." There do not appear to be any "subsequently recorded instruments" purporting to restrict the use of riparian rights,[1] until 1976.

---

[1] Technically, "riparian" rights are the rights of landowners whose property fronts on streams or rivers, while the similar term

2

Between 1955 and 1976, the County and then the City maintained the Park and made multiple improvements to it. By 1976, the Park had a stormwater system, as well as an unpaved road leading to a boat ramp on the Cove, which the City Council voted to survey and pave. There is no evidence that the ramp was being used for commercial purposes, nor was there any evidence that any restrictive covenants had been made, recorded, or accepted by the City to prevent non-commercial use of an unpaved road and a boat ramp. Nevertheless, the paving project apparently prompted four of the seven dedicators to record in the public records a Clarifying Dedication asserting that the original dedication had been intended to convey public rights only in "streets and other thoroughfares." This 1976 Clarifying Dedication expressed intent to restrict uses of the Park, as follows:

> [These Dedicators] do hereby restrict the use of said park to use for relaxing, picnicking, swimming and enjoyment of nature of the property owners and inhabitants within the subdivision known as Point Donalson, specifically restricting said property against any vehicular traffic, the launching of boats, or the use and possession upon same of any motor boat, vehicle, or motorized apparatus whatsoever, stating their intention would be that the area remain in as natural condition as possible with appropriate landscaping, shrubbery and grass.

The City Council met and discussed the Park, and one member moved to honor the four dedicators' expressed wishes. No one seconded the motion. There was no vote on, or formal acceptance of, the Clarifying Dedication. To the contrary, the City voted to proceed with the paving—having the legal effect of accepting the original public dedication (or accepting it again,

---

"littoral" refers to land on tidal waters. The terms are generally considered interchangeable as to legal effect, and the context makes it clear which physical condition exists. *See Johnson v. McCowen*, 348 So. 2d 357, 360 & nn. 3, 5 (Fla. 1st DCA 1977). (defining the terms and concluding the associated legal rights are the same).

3

depending upon one's view of the historical facts of public use and improvements). The City paved the road, and the record does not show that any dedicators or property owners took any action to stop it or remedy it. Improvements to the Park continued, as did its use by the general public for boating and related activities, without objection.

Bay County did sewer work in the Park in 1977, adding the lift station and its concrete slab in 1983. In 1996, the County transferred to the City ownership and responsibility for that sewer system. The City improved the existing boat ramp that same year. By 2005, there was also a gravel drive to the lift station; an asphalt drive to the parking area, which was gravel; a concrete boat ramp, a rail fence, bollards or rails, playground equipment, and an eight-foot round concrete slab and picnic table (though apparently the table was later removed to allow for more parking). The City policed the Park, mowed the grass, and removed derelict vessels from the boat-ramp area as needed. Though all of these activities and improvements were very public and open, there is no record evidence that the dedicators or any property owners took any preventive or remedial action.

In 2014, when the then-mayor was trying to get a grant to improve the Park, he sent a letter to Point Donalson homeowners, including Wilson and her husband, about ownership of the Park. The issue was discussed publicly, but no official action resulted. By then, Wilson and her husband had together owned their lot for 12 years, and had known about the Park's uses and controversies since purchasing their lot. But there is no record evidence that she or they got involved or did anything on the issue before the lawsuit she filed unilaterally in 2022.

In 2021, the City obtained quitclaim deeds to the Park property from some, but not all, Point Donalson property owners (including the heirs of one of the original dedicators, but not including Wilson). The City rebuilt the lift station, installing a new generator, fencing it in, and adding a roof and lights to it. In 2022, the City continued to obtain quitclaim deeds, but did not get one from Wilson or her husband as to the lot they purchased jointly in 2002.

4

**This Litigation.**

Wilson filed a declaratory-judgment action in 2022, seeking to "declare, define and limit the unauthorized use of certain real property within the subdivision of Point Donalson in Parker." Her husband, though a co-owner of their lot, did not join the lawsuit. Neither did any other lot owners, or any dedicators or successors to dedicators.

Count I of Wilson's complaint sought a declaration that the Park is private, that only Point Donalson property owners could use any part of the Park, and that such uses would be limited to those listed in the 1976 Clarifying Dedication. The remedy sought was injunctive relief barring public use.

Count II, titled "Unreasonable Use," alleged in the alternative that if the Park is public, the current use of it exceeds or is incompatible with the original use easement. Wilson alleged that public use for boating in particular exceeded any anticipated use, and became not just an eyesore but a congestion and safety issue, and deprived the Point Donalson property owners of any practical ability to use the Park for any traditional "park" activities. She provided pictures depicting Park conditions, including numerous vehicles with boat trailers in the parking lot and along the sides of the entry road.

Wilson admitted she was on notice about the historical use issues when she and her husband bought the property in 2002, but she claimed that the problems had escalated in degree. She conceded that in her opinion the lift station could remain because the owners depended on it, though she objected to the 2021 expansion of the lift station, and the roof and lights associated with that. She moved for summary judgment.

The City also moved for summary judgment, arguing that the Park had long been validly dedicated to the public and remained so, unaffected by the unilateral 1976 Clarifying Dedication, which the City had never accepted. The City argued, among other things, that Wilson was time-barred from challenging the use of the Park because she was on full notice of the issues and the use since

5

purchasing her lot in 2002, yet had taken no timely preventive or curative action.

On count I of Wilson's Complaint seeking a declaratory judgment that the Park is private, the trial court granted partial summary judgment in Wilson's favor. The judgment on appeal holds that the 1976 Clarifying Dedication established that a majority of the dedicators intended for the Park to be private. The trial court rejected the City's arguments that it owns the Park and the Park is public.

On Wilson's other claims, the court ruled that Wilson was time-barred from challenging the Park improvements that had existed as of 2007. These included the gravel and asphalt drives, gravel parking lot, concrete boat ramp, rail fence, round concrete slab, and stormwater drainage improvements, in addition to the original lift station and its concrete slab and gravel drive. Wilson did not appeal or cross-appeal these rulings. On the other hand, the trial court held that Wilson was not barred from asserting a cause of action as to the allegedly excessive 2021 expansion of the lift station footprint and improvements, which remains pending below and is stayed pending disposition of this appeal.

**Analysis.**

Even though Count II of Wilson's complaint remains pending below, we have jurisdiction because the trial court entered a partial final summary judgment declaring the Park is private. *See* Fla. R. App. P. 9.110(k) ("A partial final judgment, other than one that disposes of an entire case as to any party, is one that disposes of a separate and distinct cause of action that is not interdependent with other pleaded claims."); *see also* Fla. R. App. P. 9.130(a)(3)(B), (a)(3)(C)(ii) (permitting appeal of non-final orders granting an injunction or determining "right to immediate possession of property"). Our standard of review is de novo. *See Buie v. Bluebird Landing Owner's Ass'n, Inc.*, 172 So. 3d 519, 521 (Fla. 1st DCA 2016); *State v. City of Weston*, 316 So. 3d 398, 404 (Fla. 1st DCA 2021) (citing and quoting *Major League Baseball v. Morsani*, 790 So. 2d 1071, 1074 (Fla. 2001)).

6

We agree with the trial court's ruling that Wilson is time-barred from challenging any of the Park's uses or improvements that existed before 2017, five years before she filed suit. *See* § 95.11(6), Fla. Stat. (2022) (codifying laches bar); *Corona Props. of Fla. v. Monroe Cnty.*, 485 So. 2d 1314, 1318 (Fla. 3d DCA 1986) (holding laches will bar claims of which a plaintiff had notice but delayed in asserting). We also agree with the trial court that on remand, Wilson is entitled to pursue only her timely claims in Count II challenging the expansions that occurred in 2021 (as to the merits of which we express no opinion). However, we depart from the trial court's ruling to the extent it failed to apply a similar bar to Wilson's foundational claim about whether the Park is public or private.

## 1. The 1976 Clarifying Dedication Is Invalid.

On appeal, Wilson continues to rely heavily on the 1976 Clarifying Dedication, which she presents as being both within the scope of the original dedicators' retained rights as set forth in the 1955 Third Amended Plat, and as having the legal effect of substantially limiting permissible uses of the Park. We are thus required to examine and construe both of the relevant documents on which Wilson relies. *See Thompson v. Squibb*, 183 So. 2d 30, 32 (Fla. 2d DCA 1966) ("In construing restrictive covenants the question is primarily one of intention, and the fundamental rule is that the intention of the parties as shown by the agreement governs, being determined by a fair interpretation of the entire text of the covenant."); *see also White v. Metro. Dade Cnty.*, 563 So. 2d 117, 123 (Fla. 3d DCA 1990) (quoting *Thompson*, 183 So. 2d at 32). We find Wilson's arguments misplaced in two respects.

First, a plain reading of the original 1955 retention of rights reveals that it had a very limited scope. It did not mention the Park at all, although the Park was labeled as such for the first time in this Third Amended Plat. The act of labeling the Park on the plat had legal consequences, because that label "implies that such parcel is dedicated to the public for park purposes." *Fla. E. Coast Ry. Co. v. Worley*, 38 So. 618, 621 (Fla. 1905) (attaching "no importance" to the fact that dedicators failed to add the park to the express dedication of streets or highways, and finding that without specifically reserving the park, "the filing of the plat with the word

'Park' written upon a parcel exhibited thereon, and the sale of lots according to the plat, would operate as a dedication, notwithstanding the omission to mention the park in the dedicatory statement").

Beyond labeling the Park as such on the plat, the dedicators in unambiguous language allowed for only a limited future restriction on Park use. The dedicators first recited the status of the two earlier plats (under which no lots had been conveyed), and explained that the third plat "alters and amends rights-of-way of certain streets, drives, roads, courts and other similar thoroughfares," and "that all streets, and other thoroughfares shown on this plat are hereby dedicated for public use and public way, to be used as such . . . ." After setting forth that background and the reason for the changes, the 1955 plat set forth the language on which Wilson relies, which states as follows:

> That the undersigned owners and dedicators HEREBY RESERVE, unto themselves, and their heirs, executors, administrators, representatives and assigns, the *right* to restrict the use of all riparian rights to non-commercial purposes as normally pertain to property having water front and that such restrictions may be made by separate instrument containing such restrictive covenants and placed of record among the public records of Bay County, Florida. That the said dedicators and owners may cause *such* other restrictions to be placed upon the use of said lands shown hereon by subsequently recorded instruments as may be desirable or advisable. (Emphasis added.)

By its plain language, this reservation of rights is limited as to subject matter. It does not itself impose any restrictions on how the Park can be used. It authorizes a future restriction, which expressly applies to "riparian rights" only. The scope of such permissible future restriction is narrow: to limit riparian rights to "non-commercial purposes as normally pertain to property having water front." Further, as to procedure, the 1955 reservation of rights requires any "such" restriction—i.e., one limiting riparian rights to customary non-commercial uses—to be made by "the said dedicators and owners" by future recorded instrument.

8

Given this narrow scope of permissible use restrictions authorized in the 1955 plat language, the threshold issue is whether the 1976 Clarifying Dedication on which Wilson relies so heavily was within the scope of authority reserved in the 1955 plat. If so, another issue is whether it was validly made by "the said dedicators and owners." On its face, the 1976 document failed both tests.

The 1955 plat language authorized only a future restriction to normal "non-commercial purposes" customary for water-front property. Far beyond that permitted restriction, the 1976 Clarifying Dedication purports also to restrict the use of the Park to "relaxing, picnicking, swimming and enjoyment of nature." It would restrict authorized users to "the property owners and inhabitants" of Point Donalson. It would prohibit "any vehicular traffic, the launching of boats, or the use and possession upon same of any motor boat, vehicle, or motorized apparatus whatsoever." It would require the Park to "remain in as natural condition as possible." These purported restrictions would exceed the sole 1955-specified permissible limitation against commercial uses.[2] In contrast, there was no allegation or evidence that commercial use of the Park—the one thing that could have been prohibited under the 1955 plat—was part of the present disagreement at all.

Second, the 1976 document violates the 1955 requirements because it was not made jointly by dedicators and subdivision owners as required by the original retention of rights (excepting any of the four dedicators who happened to still own land there in 1976, which our record does not establish and would still exclude the vast majority of lot owners). Wilson conceded that the 1976 document did not include all of the dedicators, which alone defeated the attempt. *See Kirkland v. City of Tampa*, 78 So. 17, 21–22 (Fla. 1918) ("Kirkland alone could not revoke the offer; he was not the sole grantee."); *accord Weber v. City of Hollywood*, 120 So. 2d 826, 828–29 (Fla. 2d DCA 1960). The 1976 Clarifying

---

[2] One would be hard-pressed to argue that putting a private boat in the water for personal fishing or other recreation is not a normal, non-commercial use of water-front property.

9

Dedication failed to follow the process required under the 1955 plat, and exceeded the scope of the 1955 reservation of rights. Fewer than all of the dedicators, and no known lot owners, joined the purported Dedication. The 1976 Clarifying Dedication was not a valid or legally enforceable restriction.

### 2. The Dedication was Accepted.

On this record, the long history of County and then City maintenance and improvement of the Park, and open public use of it, are legally sufficient to establish governmental acceptance of the Park for public use. Acceptance "may be expressed or may be implied from acts showing an intention to accept, including, among other things, use by the public or maintenance and improvement by the proper authorities of part of the land dedicated." *Bonifay v. Dickson*, 459 So. 2d 1089, 1094 (Fla. 1st DCA 1984). Acceptance by use "is not dependent upon adverse and hostile user [sic] as defined in the law of prescription and adverse possession. On the contrary, title by dedication presupposes a use consistent with the dedicator's interest not one adverse or hostile to it." *Lovey v. Escambia Cnty.*, 141 So. 2d 761, 764 (Fla. 1st DCA 1962).

If there had been any doubt about whether the City accepted the Park for public use, no doubt remained after the City rejected the 1976 Clarifying Dedication and proceeded with more improvements to the Park supporting public use. *See Bonifay v. Garner*, 503 So. 2d 389, 391–92, 394–95 (Fla. 1st DCA 1987) (explaining common law dedication to public occurred after long public use and public improvements); *Sebolt v. State Rd. Dep't*, 176 So. 2d 590, 593–94 (Fla. 1st DCA 1965) (finding that "caus[ing] a surveying team to survey the subject right of way and install right-of-way markers . . . clearly indicate[d] an acceptance of the dedication and an intent to pre-empt for public use the property."). This Court has also found that an unrecorded plat that listed "Bay Street" (an irregular strip of land bordering the bay) was sufficiently accepted as public by long-standing public use: "The owners of lots in the subdivision and the public have used the strip as a roadway, park, and recreation area in excess of sixty years." *Mainor v. Hobbie*, 218 So. 2d 203, 204–06 (Fla. 1st DCA 1969). The Park is public.

10

### 3. Wilson's Claims Are Barred.

Beyond the threshold flaw of misplacing reliance on the 1976 Clarifying Dedication, and overlooking that the dedication was accepted, Wilson sat too long on her present argument that the Park is private. Wilson's claim is in the nature of an action to enforce an easement, and is subject to a five-year statute of limitations. § 95.11(2)(b), Fla. Stat. (2022) (setting five-year limit on a "legal or equitable action on a contract, obligation, or liability founded on a written instrument"); *see Daugherty v. McDavid*, 388 So. 3d 1151, 1155 (Fla. 1st DCA 2024) (applying section 95.11(2)(b) to action to enforce beach-access easement, and citing *Estate of Johnson v. TPE Hotels, Inc.*, 719 So. 2d 22, 26 n.9 (Fla. 5th DCA 1998)); *Fox v. Madsen*, 12 So. 3d 1261, 1262–64 (Fla. 4th DCA 2009) (recognizing five-year statute of limitations on actions to enforce restrictive agreements on real property).

Wilson and her husband bought their lot in 2002, and at that time received actual written and oral notice of the claimed issues with the Park—from one of the original dedicators, no less. Wilson admitted under oath that she lived in the neighborhood and could and did walk through the Park, and "personally observe activities at the Park on an almost daily basis." Park use issues were in the news and were matters of public meetings and records. Plus, Wilson was included in the City's 2014 mailings about the status of the Park. Her own allegations and testimony prove that she was fully aware of Park uses that she disliked, many years before filing suit.

Once Wilson became aware of (or was legally chargeable with knowledge of) the issues, she had to file suit within five years, or be forever barred. She failed to take timely action as to the public nature of the Park and as to any uses or improvements that existed more than five years before she sued. Wilson is therefore barred from challenging the public nature of the Park and its improvements and uses (except for proceeding on remand as to any timely asserted complaints about the 2021 expansion as already noted). We therefore reverse that portion of the trial court's ruling. The Park is public.

REVERSED.

11

ROBERTS and ROWE, JJ., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____


Eric Alexander Krebs and William Gerard Warner of Warner Law Firm, P.A., Panama City; Timothy James Sloan, Panama City, for Appellant.

Julia Kathleen Maddalena of Hand Arendall Harrison Sale LLC, Panama City Beach, for Appellee.